# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAMECASTER, INC., a California Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>DIRECTV, INC., a California Corporation; IGN ENTERTAINMENT, INC., a Delaware Corporation; JETBLUE AIRWAYS CORPORATION, a Delaware Corporation; and DOES 1-10, inclusive,<br><br>Defendants. | CASE NO. 06-CV-02481-H (WMC)<br><br>**ORDER DENYING PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND DENYING WITHOUT PREJUDICE PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION** |

On November 14, 2006, plaintiff GameCaster, Inc. ("Plaintiff") filed a complaint against defendants DirecTV, Inc. ("DirecTV"), IGN Entertainment, Inc. ("IGN"), and JetBlue Airways Corporation ("JetBlue;" collectively "Defendants") alleging several claims related to trademark infringement and dilution.[1] (Doc. No. 1.) On December 15, 2006, Plaintiff submitted to the Court an *ex parte* application for a temporary restraining order ("TRO") and preliminary injunction ("the application"). On December 19, 2006,

---

[1] Plaintiff's complaint also named Fox Interactive Media, Inc., Fox Broadcasting Company, Fox Entertainment Group, Inc., and News Corporation as defendants, but they were voluntarily dismissed by Plaintiff on November 30, 2006. (Doc. No. 15.)

Defendants filed an opposition. The Court held a telephonic hearing on the application on December 19, 2006. Richard Wirtz appeared on behalf of Plaintiff, and Diana Torres and David Ono appeared on behalf of Defendants. For the reasons stated below, the Court **DENIES** Plaintiff's application for a TRO and **DENIES WITHOUT PREJUDICE** Plaintiff's application for a preliminary injunction.

## **Background**

Plaintiff is a California corporation that develops, produces, and markets video game competitions and related programs for broadcast worldwide in all forms of media. (Pl.'s Mem. P. & A. Supp. Mot. TRO and Prelim. Inj. 1 ("Pl.'s Mem. P. & A.").) Plaintiff sells corporate sponsorships for such competitions and programs, licenses and sells Gamecaster-branded merchandise, and licenses and sells the Gamecaster Cybercam S2 technology, which films live video game tournaments from "within" the game. (Id.)

Plaintiff owns U.S. Service Mark Registration No. 2,931,561 for the service mark "GAMECASTER" in International Class 041, which encompasses "entertainment services, namely, staging, organizing and conducting computer and video game tournaments and events." (Notice Lodgment Supp. Pl.'s Mot. TRO and Prelim Inj., Ex. 1, at 3 ("Notice Lodgement").) The Certificate of Registration indicates that Plaintiff filed for the trademark on May 15, 2002, first used the trademark in commerce on August 24, 2004, and that the trademark was federally registered on March 8, 2005. Plaintiff also owns registered trademarks for a "GAMECASTER" mark in Europe, Australia, and Hong Kong. (Id., Ex. 2.) Plaintiff has applied for a United States trademark for the service mark "GAMECASTER" in International Classes 006, 009, 014, 016, 018, 020, 021, 025, 028, 035, and 038. (Id.) Plaintiff is also the owner of the World Wide Web URL address http://www.gamecaster.com, through which it sells merchandise with the service mark "GAMECASTER." (David MacIntosh's Decl. Supp. Pl.'s Mot. TRO and Prelim. Inj. ¶ 7 ("MacIntosh Decl."); Pl.'s Mem. P. & A. 2.)

David MacIntosh, president and chief executive officer of Plaintiff, stated in his declaration that Plaintiff has licensed its "GAMECASTER" mark, and the worldwide broadcast rights to its second Gamecaster branded video game competition, to the television station channel GamePlay HD, available nationally on Dish Network. (MacIntosh Decl. ¶ 4.)  Plaintiff has concluded taping its second video game competition, titled "Gamecaster's Battlefield 2142 Invitational Presented by GamePlay HD." (Id. ¶ 5.)  The eight episode series is scheduled to air on GamePlay HD in the first quarter of 2007. (Id.)  MacIntosh also stated that Plaintiff has entered into a licensing representation agreement with Lisa Mark & Associates regarding Plaintiff's "GAMECASTER" mark, and that Plaintiff sells merchandise bearing the mark on its online retail store. (Id. ¶¶ 6-7.)

MacIntosh stated in his declaration that on May 18, 2005, Plaintiff's representatives met with executives from DirecTV to discuss a relationship between Plaintiff and DirecTV to organize, conduct, tape, and broadcast "GAMECASTER" branded video game competitions. (Id. ¶ 8.)  Plaintiff presented its 2004 "GAMECASTER" branded television pilot and patent pending Gamecaster video game camera-controller technology during the meeting. (Id.)  Plaintiff did not receive a response to their proposal, and on January 3, 2006, DirecTV issued a press release stating that it intended to launch a video game competition league similar to the one proposed by Plaintiff. (Id. ¶¶ 9, 11.)

In May 2006, DirecTV and IGN formed the Championship Gaming Series, a video game competition league planned to be launched in 2007. (Notice Lodgement, Ex. 5, at 1.)  On July 21 through 22, 2006, DirecTV and IGN held a video game competition called the Championship Gaming Invitational ("July 2006 CGI") in San Francisco, California. (Id., Ex. 6, at 1.)  Greg Munson, an executive producer and an advisory board member of Plaintiff, stated in his declaration that he was an audience member of the July 2006 CGI on July 22, 2006, and heard the hosts of the event use the term "gamecaster" on at least two occasions. (Greg Munson's Decl. Supp. Pl.'s Mot.

TRO and Prelim. Inj. ¶ 5.)

On July 25, 2006, Plaintiff's attorney Thomas Foster sent DirecTV's attorney John Crook a letter stating that DirecTV's use of the term "GAMECASTER" in any manner for closely related goods and services constituted an infringement of Plaintiff's rights. (Notice Lodgement, Ex. 8, at 1.) On August 2, 2006, Foster e-mailed Ted Suzuki, Vice-President of Business and Legal Affairs for DirecTV, raising the same concern, indicating that Plaintiff believed that DirecTV would soon air footage of the July 2006 CGI, and requesting DirecTV take corrective action. (Id., Ex. 9, at 3.) In response, Suzuki e-mailed Foster on August 7, 2006, stating that although he did not believe the use of the term "gamecaster" to refer to the hosts/announcers at the July 2006 CGI constituted use as a trademark, the final footage of the broadcast of the July 2006 CGI would not contain the word "gamecaster." (Id. at 2.) Cort Carpenter, a member of Plainitiff's board of directors, stated in his declaration that he viewed a broadcast of the July 2006 CGI in October 2006 on DirecTV while on a JetBlue flight from San Diego to New York City, during which the term "gamecaster" was used. (Greg Munson's Decl. Supp. Pl.'s Mot. TRO and Prelim. Inj. ¶ 4, see also Notice Lodgement, Exh. 7, at 4, 7, 27 (transcript of broadcast provided by Plaintiff which describes the use of the term "gamecaster" to refer to announcers on the broadcast at least four times).)

On November 14, 2006, Plaintiff filed a complaint against Defendants alleging trademark infringement, false designation, and dilution under 15 U.S.C. § 1501, et seq. (the "Lanham Act"), common law trademark infringement under California law, dilution under section 14330 of California's Business and Professions Code, unfair competition under section 17200 of California's Business and Professions Code, and common law conversion under California law. (Compl. ¶¶ 1-81.) Plaintiff's prayer for relief for its trademark infringement, false designation, and dilution claims under the Lanham Act, and its trademark infringement and dilution claims under California law included a request for temporary, preliminary, and permanent injunctions enjoining

Defendants from using Plaintiff's "GAMECASTER" trademark, or any similar terms, to promote its products or services, and from falsely designating or diluting the "GAMECASTER" mark. (Id. at p. 12.) Plaintiff's prayer for relief for its unfair competition claim included a request for temporary, preliminary, and permanent injunctions enjoining Defendants from competing unfairly against Plaintiff. (Id.)

On December 15, 2006, Plaintiff submitted to the Court the application requesting an order requiring Defendants to immediately cease from distributing or broadcasting the July 2006 CGI recording in its current form containing the mark "GAMECASTER," edit the use of the mark "GAMECASTER" from the production of the July 2006 CGI, and cease all use of the term "GAMECASTER" in current or future activities, recordings, or productions. (Pl.'s Mem. P. & A. 6.) The Court declined the *ex parte* application, and scheduled a telephonic hearing involving all of the parties for December 19, 2006. During the hearing, the parties agreed to file a joint stipulation by December 22, 2006, indicating that Defendants will not rebroadcast any portion of the July 2006 CGI using the term "gamecaster," or use the term "gamecaster" during the broadcast of its second Championship Gaming Invitational special, at least until the issues in this suit are resolved or this Court orders otherwise.[2]

## Discussion

**1.   Legal Standard for Temporary Restraining Order and Preliminary Injunction**

A TRO is a form of preliminary injunctive relief whose sole purpose is to preserve the status quo pending a hearing on the moving party's application for a preliminary injunction. See Schwarzer, et al., Cal. Practice Guide: Federal Civil Procedure Before Trial, ¶ 13:7, p. 13-4 (The Rutter Group 2006) (citing Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers, 415 U.S. 423, 439 (1974)). A preliminary injunction is a device for preserving the status quo and

---

[2] The specific language of the joint stipulation to be filed by the parties is left up to the parties.

preventing the irreparable loss of rights before a judgment in the suit. See Textile Unlimited, Inc. v. A..BMH and Co., Inc., 240 F.3d 781, 786 (9th Cir. 2001). The same standard governs the issuance of both TROs and preliminary injunctions. See, e.g., Cal. Indep. Sys. Operator Corp. v. Reliant Energy Servs., Inc., 181 F. Supp. 2d 1111, 1126 (E.D. Cal. 2001) ("The standard for issuing a preliminary injunction is the same as the standard for issuing a temporary restraining order .").

A plaintiff can demonstrate it is entitled to a temporary restraining order or preliminary injunction in one of two ways. First, using the "traditional criteria," a plaintiff must demonstrate: (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases). See Earth Island Inst. v. U.S. Forest Serv., 442 F.3d 1147, 1158 (9th Cir. 2006). Alternatively, a plaintiff may show "*either* a combination of probable success on the merits and the possibility of irreparable harm or that serious questions are raised and the balance of hardships tips sharply in his favor." Id. (emphasis in original). "This analysis creates a continuum: the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor." Southwest Voter Registration Educ. Project v. Shelley, 344 F.3d 914, 918 (9th Cir. 2003). Even if the balance of hardships tips decidedly in favor of the moving party, however, it must be shown as an irreducible minimum that there is a fair chance of success on the merits. See Johnson v. California State Bd. of Accountancy, 72 F.3d 1427, 1430 (9th Cir. 1995).

In a trademark infringement claim, "irreparable injury may be presumed from a showing of likelihood of success on the merits." See Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1045 (9th Cir.1999) (citing Metro Pub., Ltd. v. San Jose Mercury News, 987 F.2d 637, 640 (9th Cir.1993)). This presumption effectively conflates the dual inquiries of the 'probable success on the

merits and the possibility of irreparable harm' test into the single question of whether the plaintiff has shown a likelihood of success on the merits. See GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1205 n.4 (9th Cir. 2000).

**2.     Likelihood of Success on the Merits as to Trademark Infringement**

Plaintiff first argues that it is likely to succeed on its trademark infringement claims. A trademark is a "word, name, symbol, or device, or any combination thereof," either used by a person, or which a person has a bona fide intention to use in commerce and applies to register on the principal register established by sections 1051 to 1072 of title 15 of the United States Code, "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods . . . ." 15 U.S.C. § 1127. A federal court may grant an injunction to prevent the violation of the rights of a registrant of a registered mark or to prevent a violation under section 1125(a) of title 15 of the United States Code, relating to false designation of origin or false description or representation. See id. §§ 1114, 1125.

**A.     Likelihood That Plaintiff Has a Valid Protectable Interest in the "GAMECASTER" Mark**

In order to determine if Plaintiff has a likelihood of proving Defendants liable for trademark infringement, the Court must first determine if it is likely that Plaintiff owns a valid, protectable interest in the "GAMECASTER" mark. In order to be protected, a mark must be distinctive such that it is capable of distinguishing the applicant's goods or services from the goods and services of others. See Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery, 150 F.3d 1042, 1047 (9th Cir. 1998). Marks are classified in one of five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. See id. "The latter three categories of marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive." Id. (quoting Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992)). At the other end of the

spectrum are generic marks, which give the general name of the product or embrace an entire class of products, and which can never meet the distinctiveness element. See id. "Marks that are descriptive fall in the middle of these two extremes." Id. "Descriptive marks" define qualities or characteristics of a product or service in a straightforward way that requires no exercise of the imagination to be understood. See id. at 1047 n.8. Plaintiff's "GAMECASTER" mark describes a video game broadcaster in a straightforward way, combining the English words game and caster. Accordingly, the Court concludes that Plaintiff's "GAMECASTER" mark is descriptive.

Descriptive marks are not inherently distinctive and therefore do not initially satisfy the distinctiveness element of a trademark infringement claim. See id. "But descriptive marks can acquire distinctiveness if the public comes to associate the mark with a specific source." Id. Such acquired distinctiveness, which is referred to as "secondary meaning," allows a suit to be brought for infringement of a descriptive mark that otherwise could not qualify for protection as a trademark. See id.

Plaintiff argues that its "GAMECASTER" mark is not generic, and is not commonly used to refer to broadcasting announcers in a video game competition. (Pl.'s Mem. P. & A. 11; MacIntosh Decl. ¶¶ 17-18.) Plaintiff also claims that its mark is famous. (Pl.'s Mem. P. & A. 12.) Whether Plaintiff could succeed in showing secondary meaning is disputed. Defendants contend that their use of the word "gamecaster" was not in a trademark sense, and therefore did not denote a specific source. See Anti-Monopoly, Inc. v. Gen. Mills Fun Group, 611 F.2d 296, 301 (9th Cir. 1979) (abrogated by statute on other grounds, as recognized in Christian Science Bd. of Directors of First Church of Christ, Scientist v. Evans, 105 N.J. 297, 310-12 (1987)). Similarly, if the use of the word "gamecaster" was not used in a trade mark sense, there is no liability for dilution. See Avery Dennison Corp. v. Sumpton, 189 F.3d 868, 880 (9th Cir. 1999). Accordingly, at this stage of the proceeding, the Court is unable to determine whether Plaintiff would likely prevail on the merits of its claim for

trademark infringement.

B. **Likelihood of Confusion**

"The test for a trademark infringement claim under federal, state, and common law is whether there will be a likelihood of confusion." M2Software, Inc. v Madacy Entertainment, 421 F.3d 1073, 1080 (9th Cir. 2005); see also Cleary v. News Corp., 30 F.3d 1255, 1262-63 (9th Cir. 1994) (holding that claims under the Lanham Act and California Business and Professions Code section 17200 are "substantially congruent"). In AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979) (abrogated on other grounds in Mattel, Inc. v. Walking Mountain Prods., 353 F.3d 792 (2003)), the Ninth Circuit articulated an eight factor test for determining the likelihood of confusion in a trademark action. Applied to this case, they are (1) the similarity of the marks; (2) the relatedness of the two companies' good or services; (3) the marketing channel used; (4) the strength of Plaintiff's mark; (5) DirecTV and IGN's intent in selecting its mark; (6) evidence of actual confusion; (7) the likelihood of expansion into other markets; and (8) the degree of care likely to be exercised by purchasers. See GoTo.com, Inc., 202 F.3d at 1205 (citing Sleekcraft, 599 F.2d at 348-49). "Some Sleekcraft factors are much more important than others, and the relative importance of each individual factor will be case specific." M2 Software, Inc., 421 F.3d at 1080 (citing Brookfield, 174 F.3d at 1054). The determination of which factors are most important turns on whether a reasonably prudent consumer in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks. See id. (citing Dreamwerks Prod. Group, Inc. v. SKG Studio, 142 F.3d 1127, 1129 (9th Cir. 1998); see also Eclipse Associates Ltd. v. Data General Corp., 894 F.2d 1114, 1118 (9th Cir. 1990) ("The district court's primary task, in determining infringement of registered trademarks, is to make the factual determination whether the public is likely to be deceived or confused by the similarity of the marks as to source, relationship or sponsorship.")). In the application, Plaintiff addresses the similarity of the marks, proximity of the goods, and marketing channels factors, citing GoTo.com.

1  See GoTo.com, 202 F.3d at 1205 ("In the context of the Web in particular, the three
2  most important Sleekcraft factors are (1) the similarity of the marks, (2) the relatedness
3  of the goods or services, and (3) the simultaneous use of the Web as a marketing
4  channel. . . .  Together with the relatedness of the services and the use of a common
5  marketing channel, [the similarity of the marks factor] constitutes part of the
6  controlling troika in the Sleekcraft analysis.").

7  The similarity of the marks is always an important factor in the Sleekcraft
8  analysis. See Brookfield, 174 F.3d at 1054. "[T]he more similar the marks in terms of
9  appearance, sound, and meaning, the greater the likelihood of confusion. See id.  In
10 analyzing this factor, the marks must be considered in their entirety as they appear in
11 the marketplace, with similarities weighed more heavily than differences.  See id.

12 Plaintiff argues that DirecTV and IGN's identification of their announcers as
13 "gamecasters" during the broadcast of the July 2006 CGI constitutes the use of an
14 identical mark in sound, sight and meaning to their "GAMECASTER" trademark.
15 Defendants argue that they did not use the term "gamecaster" in a source-denoting,
16 trademark sense at all, and therefore they did not use a similar mark.  See Anti-
17 Monopoly, 611 F.2d at 301.

18 Plaintiff also argues that DirecTV and IGN's use of the term "gamecaster" is in
19 the context of the identical goods and service to those provided by Plaintiff, the
20 broadcast of video game tournaments and related merchandise. Additionally, Plaintiff
21 argues that the marketing channels used by DirecTV/IGN and Plainiff are the same
22 because they all sell and advertise their goods and services on the internet, and because
23 Plaintiff's video game competitions and DirectTV/IGN's competitions are broadcast
24 on satellite networks.

25 Given the uncertainty as to whether the use of the term "gamecaster" at the July
26 2006 CGI denoted a use in a trademark sense, and the importance of the 'similarity of
27 the marks' factor, the Court is again unable to determine at this early stage whether
28 Plaintiff is likely to succeed on the merits of its trademark infringement claim.

**3.    Dilution Claims**

   **A.    Likelihood of Success on Merits as to Dilution Claim**

The Ninth Circuit has stated that a dilution claim is subject to the same analysis whether it is brought under the Federal Trademark Dilution Act (section 43(c) of the Lanham Act) or under section 14330 of California's Business and Professions code. See Panavision Intern., L.P. v. Toeppen, 141 F.3d 1316, 1324 (9th Cir. 1998). In either claim, the Panvision Intern. court stated, a plaintiff must show: "(1) the mark is famous; (2) the defendant is making a commercial use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services." Id. (citing 15 U.S.C. § 1125(c)). Section 1125(c) of title 15 of the United States Code was amended, however, on October 6, 2006. See Trademark Dilution Revision Act of 2006, Pub. L. No. 109-312, § 2, 120 Stat. 1730, 1730-32 (2006). Section 1125(c)(1) currently reads that:

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

The Court concludes that the amended statute only affects the fourth prong of the dilution test, allowing a plaintiff to bring a successful dilution claim without proof that defendant's use of the mark is diluting the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services, as long as the plaintiff proves that defendant's use is likely to cause dilution by blurring or tarnishment.

### 1.  **Defendant's Commercial Use of the Mark in Commerce**

The second prong of the dilution test requires a plaintiff to prove that the defendant is making a commercial use of the mark in commerce. "Commercial use under the Federal Trademark Dilution Act requires the defendant to be using the trademark as a trademark, capitalizing on its trademark status." Avery Dennison Corp., 189 F.3d at 880 (citing Panavision, 141 F.3d at 1325). A defendant who uses words that happen to be trademarks for their non-trademark value does not use the mark in commerce for purposes of establishing a dilution cause of action. See id. As previously discussed, Defendants argue that the use of the term "gamecaster" during the July 2006 CGI did not denote the use of that term in a trademark sense. Accordingly, the Court is unable to determine at this early stage whether Plaintiff is likely to succeed on the merits of its dilution claim.

### 2.  **Fame of Plaintiff's "GAMECASTER" Mark, Whether Defendant's Use Began after Plaintiff's Mark Became Famous, and Whether Defendant's Use of the Mark Is Likely to Cause Dilution by Blurring or Tarnishment**

Section 1125(c)(2) of title 15 of the United States Code states that for purposes of a dilution claim, "a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." The statute lists four non-exclusive considerations for the famousness inquiry: (1) the duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; (2) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (3) the extent of actual recognition of the mark; and (4) whether the mark was registered under the Act of March 3, 1881, or the Act of

February 20, 1905, or on the principal register.[3] Section 1125(c)(1) requires a plaintiff to prove that a defendant used the mark in commerce after it became famous.

"Dilution by blurring" is association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark. 15 U.S.C. § 1125(c)(2)(B). In determining whether a mark or trade name is likely to cause dilution by blurring, the court may consider all relevant factors, including the following: (1) the degree of similarity between the mark or trade name and the famous mark; (2) the degree of inherent or acquired distinctiveness of the famous mark; (3) the extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark; (4) the degree of recognition of the famous mark; (5) whether the user of the mark or trade name intended to create an association with the famous mark; and (6) any actual association between the mark or trade name and the famous mark. Id. "Dilution by tarnishment" is association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark. See id. at § 1125(b)(2)(C).

Plaintiff's trademark application indicates that the "GAMECASTER" service mark was first used in commerce in August 2004. Plainitiff argues that the approximately two years that have passed since August 2004 is a lengthy period of time for a young industry. Plaintiff also argues that because Plaintiff promotes its goods and services on the internet, there is no geographic limit to the reach of its advertising. Additionally, Plaintiff seems to argue that Defendants' use of the term "gamecaster" caused dilution by blurring. Given the uncertainty regarding the

---

[3] Plaintiff cites to the previous list of non-exclusive factors listed in the since amended section 1125(c)(1)(A)-(H): (1) the degree of inherent or acquired distinctiveness of the mark; (2) the duration and extent of use of the mark in connection with the goods or services with which the mark is used; (3) the duration and extent of advertising and publicity of the mark; (4) the geographical extent of the trading area in which the mark is used; (5) the channels of trade for the goods or services with which the mark is used; (6) the degree of recognition of the mark in the trading areas and channels of trade used by the mark's owner and the person against whom the injunction is sought; (7) the nature and extent of use of the same or similar marks by third parties; and (8) whether the mark was registered on the principal register.

threshold question of whether Defendants ever used Plaintiff's "GAMECASTER" mark in commerce, however, the Court does not need to reach the issues of whether Plaintiff is likely to succeed on the merits regarding the other requirements of a dilution claim.

### B. Possibility of Irreparable Harm Based on Plaintiff's Dilution Claim

Plaintiff argues that similar to the way that proving a strong likelihood of confusion creates the presumption of irreparable harm, proving a likelihood of dilution creates the presumption of irreparable harm. Again, since Plaintiff has failed to show that it is likely to succeed on the merits regarding whether Defendants used Plaintiff's "GAMECASTER" mark in commerce, the Court does not need to reach this issue.

### 4. Balance Of Harms

Even if Plaintiff fails to prove a probability of success on the merits of its claim, it may still be entitled to preliminary injunctive relief upon a showing that serious questions are raised and the balance of hardships tips sharply in its favor. See Earth Island Inst., 442 F.3d at 1158. Serious questions, for purpose of the alternative preliminary injunction test, means questions that involve a fair chance of success on the merits that cannot be resolved one way or the other at the hearing on the injunction, and as to which the court perceives a need to preserve the status. See Republic of Philippines v. Marcos, 862 F2d 1355, 1362 (9th Cir. 1988).

Plaintiff argues that the Court should conclude that the balance between the harm Plaintiff would suffer if the Court was to deny the TRO request against the harm that Defendants would suffer if the request was granted tips sharply in favor of Plaintiff. Plaintiff argues that without the requested relief, Plaintiff will suffer harm to the goodwill it has established. See Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc., 944 F.2d 597, 603 (holding that damage to goodwill qualifies as irreparable harm in a preliminary injunction analysis). Defendants argue that they will suffer harm in the form of a prior restraint of their first amendment rights of free speech if a TRO or injunction is granted preventing them from using the term

1  "gamecaster."  Defendants have failed to address the relativeness of the fact that an
2  injunction in this case would likely be in the realm of commercial speech, significantly
3  weakening their prior restraint argument.  Regardless, under the totality of the
4  circumstances, including the fact that the parties have agreed to file a joint stipulation
5  by December 22, 2006, indicating that DirecTV will not rebroadcast any portion of the
6  July 2006 CGI using the term "gamecaster," or use the term "gamecaster" during the
7  broadcast of its second Championship Gaming Invitational special, the Court
8  concludes that Plaintiff has failed to show that the balance of hardships tips sharply in
9  its favor.  Accordingly, the Court declines to grant Plaintiff's request for a TRO or a
10 preliminary injunction based on the 'serious questions are raised and the balance of
11 hardships tips sharply in plaintiff's favor' test.

## Conclusion

For the reasons discussed, the Court **DENIES** Plaintiff's application for a TRO, and **DENIES WITHOUT PREJUDICE** Plaintiff's request for a preliminary injunction.  If, after appropriate discovery, Plaintiff believes it meets the requirements for a preliminary injunction, it should contact the Court so that the application can be calendared for a noticed hearing pursuant to Civil Local Rule 7.1.  The Court **ORDERS** the parties to file their joint stipulation regarding Defendants' use of the term "gamecaster" on or before **Friday, December 22, 2006 at 2:00 p.m.**

IT IS SO ORDERED.

DATED:  December 20, 2006

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

1 | COPIES TO:

2 | Richard Michael Wirtz
Wirtz Hellenkamp
3 | 12760 High Bluff Drive
Suite 300
4 | San Diego, CA 92130

5 | Diana M Torres
O'Melveny & Myers
6 | 400 South Hope Street
Suite 1050
7 | Los Angeles, CA 90071-2899

8 | Jonathan Gottlieb
Fox Legal Group
9 | PO Box 900
Beverly Hills, CA 90213

10 |

Joanna Geraghty
11 | JetBlue Airways Corporation
118-29 Queens Blvd.
12 | Forest Hills, NY 11375

13 |
14 |
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |